**McMANIMON, SCOTLAND & BAUMANN, LLC**
75 Livingston Avenue, Second Floor
Roseland, New Jersey 07068
(973) 622-1800
Anthony Sodono, III (asodono@msbnj.com)
Thomas M. Walsh (twalsh@msbnj.com)
Sari B. Placona (splacona@msbnj.com)
*Proposed Counsel for*
*Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re: | Chapter 11 |
| HAJJAR BUSINESS HOLDINGS, LLC, *et al.*,[1] | Case No. 20-12465 (JKS) |
| | (Joint Administration Pending)[2] |
| Debtors. | |

**DECLARATION OF DR. JOHN H. HAJJAR IN SUPPORT**
**OF CHAPTER 11 FILING AND FIRST DAY MATTERS FOR**
**THE CHAPTER 11 DEBTORS**

---

[1] The Debtors in these chapter 11 cases, along with their case numbers and the last four digits of each Debtor's taxpayer identification number are as follows:  Hajjar Medical Office Building of Wayne, LLC (2608) (Case No. 20-12464-JKS); Hajjar Business Holdings, LLC (9371) (Case No. 20-12465-JKS); Hajjar Medical Office Building of Roseland, LLC (0506) (Case No. 20-12466-JKS); Hajjar Medical Building of Carlstadt, LLC (9831) (Case No. 20-12467-JKS); Hajjar Medical Office Building of Fairlawn, LLC (8256) (Case No. 20-12468-JKS); Hajjar Medical Office Building of Glen Rock, LLC (2638) (Case No. 20-12469-JKS); Hajjar Medical Office Building, LLC (6934) (Case No. 20-12470-JKS); Hajjar Medical Office Building of Hackensack, LLC (4021) (Case No. 20-12471-JKS); Hajjar Medical Office Building of Jersey City, LLC (6457) (Case No. 20-12472-JKS); Hajjar Warehouse of Hackensack, LLC (0093) (Case No. 20-12473-JKS); Hajjar Medical Office Building of Mount Kisco, LLC (0290) (Case No. 20-12474-JKS); Hajjar Office Building of Miramar, LLC (9467) (Case No. 20-12475-JKS); and Hajjar Medical Office Building of New Brunswick, LLC (6376) (Case No. 20-12476-JKS); HMOB of Mt. Kisco Owner, LLC (8251) (Case No.20-12540-JKS); HMOB of New Brunswick Owner, LLC (8560) (Case No. 20-12549-JKS); HMOB of Roseland Owner, LLC (xxxx) (Case No. 20-12552-JKS); HMOB of Jersey City Owner, LLC (8644) (Case No. 20-12557-JKS); HMOB of Carlstadt Owner, LLC (8378) (Case No. 20-12553-JKS); HMOB of Fair Lawn 15-01 Broadway Owner, LLC (xxxx) (Case No. 20-12536-JKS); HMOB of Fair Lawn Owner, LLC (0822) (Case No. 20-12547-JKS); HMOB of Glen Rock Owner, LLC (4671) (Case No. 20-12545-JKS); HMOB of Hackensack Office Owner, LLC (8445) (Case No. 20-12555-JKS); HMOB of Hackensack Warehouse Owner, LLC (3721) (Case No. 20-12556-JKS); HMOB of Miramar Owner, LLC (9467) (Case No. 20-12543-JKS); HMOB of Oradell Owner, LLC (4779) (Case No. 20-12551-JKS); HMOB of Wayne Owner, LLC (9177) (Case No. 20-12550-JKS).

[2] Chapter 11 bankruptcy petitions for the above debtors have been filed on February 13 & 14, 2020.  The Debtors are filing a motion for joint administration of all cases.

**JOHN HAJJAR,** of full age, pursuant to 28 U.S.C. § 1746, hereby certifies and declares as follows:

1.      I am the managing member and 100% owner of HMOB Wayne Owner, LLC; HMOB of Oradell Owner, LLC; HMOB of Carlstadt Owner, LLC; HMOB of Hackensack Office Owner, LLC; HMOB of Hackensack Warehouse Owner, LLC; HMOB of New Brunswick Owner, LLC; HMOB of Roseland Owner, LLC; HMOB of Jersey City Owner, LLC; HMOB of Fair Lawn Owner, LL; HMOB of Glen Rock Owner, LLC; HMOB of Fair Lawn 15-01 Broadway Owner, LLC; HMOB of Mt Kisco Owner, LLC; HMOB of Miramar Owner, LLC (the "**Owner Debtors**") and the managing partner and owner in whole or part through B&B Hajjar Investments, LLC, Hajjar Business Holdings, LLC; Hajjar Medical Office Building, LLC; Hajjar Medical Office Building of Carlstadt, LLC; Hajjar Medical Office Building of Hackensack, LLC; Hajjar Medical Office Building of Jersey City, LLC; Hajjar Warehouse of Hackensack, LLC; Hajjar Medical Office Building of Fairlawn, LLC; Hajjar Medical Office Building of Glen Rock, LLC; Hajjar Medical Office Building of Wayne, LLC; Hajjar Medical Office Building of Roseland, LLC; Hajjar Medical Office Building of New Brunswick, LLC; Hajjar Medical Office Building of Mount Kisco, LLC; and Hajjar Medical Office Building of Miramar, LLC (collectively, the "**Operating Debtors**").

2.      The Owner Debtors and Operating Debtors are the debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 bankruptcy cases. I am fully familiar with the business and financial affairs of the Owner Debtors and Operating Debtors, including the facts and circumstances set forth herein. Attached as **Exhibit A** is a chart of the Debtors and ownership percentages.

4813-3038-5844, v. 1

3.      I submit this declaration (the "**Declaration**") in support of the Debtors' voluntary

petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**")

and the relief that the Debtors have requested from the Court in various motions and applications

filed contemporaneously herewith (the "**First-Day Pleadings**").  The relief sought in each of the

First-Day Pleadings (1) is necessary to enable the Debtors to operate in chapter 11 with minimal

disruption to their operations without loss of value; and (2) best serves the interests of the Debtors'

estate, creditors, and other parties in interest.

4.      Except as otherwise indicated, the facts set forth in this Declaration are based on

my personal knowledge, information supplied to me by other members of the Debtors'

management or their professionals, information learned from my review of relevant documents,

including financial information, or my opinion based upon my experience and knowledge of the

Debtors' operations and financial condition.  This Declaration is intended to provide a brief

background of the Debtors, a description of the Debtors and their services, the reasons for the

Debtors' chapter 11 filings, the Debtors' objectives in the chapter 11 process, and a summary of

the relief sought in each of the First-Day Pleadings.

5.      If called as a witness in the Debtors' bankruptcy proceedings, I could and would

testify to the best of my knowledge competently to the facts set forth in this Declaration.  Unless

otherwise indicated, all financial information set forth in this Declaration is presented on an

unaudited basis.

**<u>Background</u>**

6.      I am currently 65 years old.

7.      I was born in Syria of Armenian descent.  I emigrated to the United States at the age of 13 and have been a citizen of the United States since 1973.  I grew up in Paterson, New Jersey.  I currently reside at 90 Hoover Drive, Cresskill, New Jersey 07626.

**Education Background and Early Career**

8.      I attended St. John's University and Georgetown Medical School.  I graduated medical school in 1981.  Afterwards I performed my residency at New York University.  I am a urology specialist and have been practicing medicine for thirty-one (31) years.  I was a pioneer in my field.  I was the first to use laser surgery for prostate enlargement.

9.      I opened my first practice in 1987 in Fair Lawn, New Jersey.  This location is still operating at 15-01 Broadway, Fair Lawn, New Jersey, and is known as Hajjar Business Holdings.

10.      In or about 1989, my practice started to grow at a tremendous rate.

11.      In 1999, I attended the University of Tennessee and obtained a Master of Business Administration ("**MBA**") and conducted my thesis on office space for surgery center planning.

**Surgery Centers**

12.      My vision included owning and operating surgery centers either in whole or part with investors.  Surgery centers were started in the 1970's in Arizona as an alternative to having surgeries performed in a hospital.

13.      In 1990, I opened the first surgery center in New Jersey.  This center was located in Bergen County.  It was not until 1992 that New Jersey formed the New Jersey Association of Ambulatory Surgery Centers (NJAASC) as an incorporated non-profit organization.  A surgery center, which is also referred to as an ambulatory surgery center ("**ASC**"), means a freestanding ambulatory surgical facility that meets all of the following requirements:  licensing standards and is set up, equipped and operated to provide general surgery.  ASCs are modern health care facilities

4813-3038-5844, v. 1

focused on providing same-day surgical care, including diagnostic and preventive procedures. ASCs have transformed the outpatient experience for millions of Americans by providing them with a more convenient alternative to hospital-based outpatient procedures. Since 2009, New Jersey has placed a moratorium on new surgery centers.

14.    Shortly after I opened my initial surgery center, I purchased, in part, a building in which the surgery center was located; namely Hajjar Business Holdings, LLC, one of the Debtors herein.

15.    For thirteen years, from 1992 until 2005, I owned one-hundred percent of three surgery centers. In 2005, reimbursements to physicians decreased due to rise in health maintenance organizations ("**HMO**"). In short, HMOs controlled the prices paid for surgery. For example, an out of network hernia surgery may reimburse a physician $2,000; however, an "in-network" HMO reimbursement may yield a payment of $600. Thus, a seismic shift occurred in or about 2005 when HMOs became more prevalent.

16.    I opened more surgery centers and other doctors became investors. At one point, I owned fifteen surgery centers across New Jersey, New York, and Florida.

**Radiation Centers**

17.    In 2014, I opened a radiation oncology center ("**Radiation Centers**"). Eventually I developed four Radiation Centers, however, from 2013 to 2015, reimbursements from insurers started to decline.

18.    Currently, I own four Radiation Centers. They are located in Jersey City (Hajjar Medical Office Building of Jersey City), Hackensack (Hajjar Medical Office Building of Hackensack), New Brunswick (Hajjar Medical Office Building of New Brunswick), and Wayne

(Hajjar Medical Office Building of Wayne). The Radiation Center located in Jersey City is leased by Saint Barnabas Hospital.

19.     The center located in Hackensack closed about a year ago. This center reopened just recently and Heme Oncology ("**Heme**") is now a tenant. Heme will commence paying rent in April 2020.

20.     The center located in New Brunswick is leased by St. Peters Hospital.

21.     The center located in Wayne, as of February 15, 2020, is occupied by St. Joseph's Medical Center. A potential buyer is interested in acquiring the Wayne property.

## Sovereign Entities

22.     I am the founder, chairman, and chief executive officer of Sovereign Health System a/k/a Sovereign Medical Services, Inc. ("**Sovereign Medical**"). Sovereign Medical holds membership interests in several affiliated companies. Such affiliated companies employ approximately 430 employees. Sovereign Medical, owned and/or affiliated entities, lease space from the Operating Entities.

23.     I own one-hundred percent of Sovereign Capital Holdings, LLC ("Sovereign Capital"). Sovereign Capital owns 57.4 percent of Sovereign Medical.

24.     Sovereign Medical is a Delaware C-Corp which has one-hundred percent ownership of Surgem, LLC ("**Surgem**"). Surgem was created in 2005. Surgem is the management company that manages surgery centers. Surgem has equity in each surgery center.

## Regent

25.     I own one-hundred percent of Regent Medical Properties, LLC ("Regent"). Regent is the real estate management company for the Operating Debtors.

4813-3038-5844, v. 1

## BACKGROUND OF THE DEBTORS

### Operating Debtors

26.     The Operating Debtors consist of thirteen single asset real estate facilities.  Tenants lease directly with the Operating Debtors.  The Operating Debtors do not have any employees. Regent's employees service the Operating Debtors by maintaining the buildings. In turn, and in part, rents are utilized to pay Regent's management fee (4%) and for reimbursement of costs.  The rents are paid directly to the Operating Debtors or a lockbox.

27.     I own one-hundred percent of B&B Hajjar Investments, LLC ("**B&B**"), which in turn owns, in whole or part, the Operating Debtors.

### Hajjar Medical Office Building ("HMOB"), LLC

28.     I own one-hundred percent of B&B, which owns one-hundred percent of HMOB. It is located at 555 Kinderkamack Road in Oradell, New Jersey.  HMOB was formed on October 2, 2000.  HMOB is a landlord and leases space to the following entities:  Surgicare Surgical Associates of Oradell, LLC for 9,900 square feet; Dumont Cosmetic Dental, LLC for 2,065 square feet; New Century Imaging for 10,846 square feet; and Sovereign Medical Group for 3,000 square feet.  There are two vacant spaces at this property for 2,950 square feet and 560 square feet.  I have a proposed purchaser for this property.  New Century Imaging, however, as the tenant, has a right of first refusal, and it has expressed interest at a below market purchase price.

### Hajjar Medical Office Building of Carlstadt, LLC ("Hajjar Carlstadt")

29.     Hajjar Carlstadt was formed on April 10, 2006.  I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar Carlstadt.  It is a three-story multi-tenant medical office building that contains 25,251 square feet.  It is located at 630 Broad Street,, Carlstadt, New

7

Jersey.  It serves as a landlord and leases space to the following entities:  Surgicare Surgical Associates of Carlstadt, LLC for 9,020 square feet; Feabas, LLC for 4,119 square feet; and City Orthopedics & Sports Medicine, LLC for 1,502 square feet.  There are two vacant spaces (one for 9,249 square feet and the other for 1,361 square feet).  I have received inquiry from a proposed purchaser for Hajjar Carlstadt.

30.     On April 22, 2016, Cushman & Wakefield of New Jersey, Inc. ("**C&W**") conducted an appraisal and valued Hajjar Carlstadt at $11,800,000.

**Hajjar Medical Office Building of Hackensack, LLC ("Hajjar Hackensack")**

31.     I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar Hackensack.  It is located at 20 Woodridge Avenue, Hackensack, New Jersey.  Hajjar Hackensack is a landlord and leases space to NJ Cancer & Blood Specialists, PC for 6,000 square feet.

32.     This is a one-story single-tenant medical office building that contains 6,600 square feet of rentable area.  On April 22, 2016, C&W conducted an appraisal of the property and valued Hajjar Hackensack at $3,000,000.

**Hajjar Medical Office Building Warehouse of Hackensack, LLC ("Hajjar Warehouse Hackensack")**

33.     Hajjar Warehouse Hackensack is a limited liability company formed on June 7, 2012.  I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar Warehouse Hackensack.  It is located at 403-405 West Pleasant View Avenue, Hackensack, New Jersey.  It is a one-story single-tenant industrial building that contains 16,250 square feet of rentable area.

34.     It leases space to General Floor Industries, Inc. and National Metering Services, Inc.

35.     On April 22, 2016, C&W conducted an appraisal and valued Hajjar Warehouse Hackensack at $1,900,000.

4813-3038-5844, v. 1

## Hajjar Medical Office Building of Mount Kisco, LLC ("Hajjar Mt. Kisco")

36.    Hajjar Mt. Kisco is located at 103-105 South Bedford Road, Mount Kisco, New York.  I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar Mt. Kisco.

37.    This property consists of two and three-story multi-tenant medical office buildings that contains 71,915 square feet of rentable area.  On April 22, 2016, C&W conducted an appraisal and listed Hajjar Mt. Kisco's market value as-is at $23,400,000.  Hajjar Mt. Kisco is the landlord and leases space to the following entities:

| Tenant | Square Feet |
| --- | --- |
| Dr. Ken Landesman (lande   ) | 1,383.00 |
| Lawrence Goettisheim, D.D.S. (goett   ) | 2,392.00 |
| Dr. Steven C. Abel (abel    ) | 1,542.00 |
| D&M Maids, LLC (molly   ) | 639.00 |
| Axiom Capital Management, Inc. (axiom   ) | 700.00 |
| TG Management, Inc. (goal    ) | 1,000.00 |
| Dr. Robert Frankel, DDS (frank   ) | 1,000.00 |
| Dr. Lewis J. Kass, M.D. (kass    ) | 1,385.00 |
| Kenneth R. Nadler Consulting, LLC (nadler  ) | 2,400.00 |
| Dr. Weber - Northern Westchester Oral & Maxillofacial Surgery Associates, PLLC (weber   ) | 1,044.00 |
| Fairweather Megennis (fair    ) | 829.00 |
| Lois Tuerk-Mendelsohn M.D. P.C (mendel  ) | 1,494.00 |
| CareMount Medical, P.C. (caremt  ) | 8,991.00 |
| Westchester Health Associates, PLLC (whac    ) | 3,114.00 |

4813-3038-5844, v. 1

| | |
|---|---|
| Westchester Health Associates, OBGYN (whao  ) | 5,240.00 |
| Merrill Lynch, Pierce, Fenner & Smith Inc. (merrill ) | 12,310.00 |
| Dr. Joel Himelfarb (himmel  ) | 1,761.00 |
| Image Guided Services, LLC (image   ) | 2,199.00 |
| Dr. Craig Fern (fern    ) | 2,315.00 |
| South Bedford Oral & Maxillofacial Surgery, LLC (sboral  ) | 8,470.00 |
| Dr. Robert D. Aufrichtig, DMD, P.C. (aufrich ) | 1,180.00 |
| Dr. Loan Mao, DDS, P.C. (mao    ) | 2,313.00 |

There are eight spaces vacant for a total square footage of 9,014 square feet.  I have a proposed purchaser for this property.

**Hajjar Medical Office Building of New Brunswick, LLC ("Hajjar New Brunswick")**

38.    Hajjar New Brunswick was formed on September 25, 2012, and is located at 215 Easton Avenue, New Brunswick, New Jersey.  I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar New Brunswick.

39.    Hajjar New Brunswick consists of 6,330 square feet of medical office space.  Hajjar New Brunswick is the landlord and leases space to the following entities: St. Peter's University Hospital, Inc. for 6,330 square feet and St. Peter's Healthcare System, Inc. for 6,330 square feet.

**Hajjar Medical Office Building of Roseland, LLC ("Hajjar Roseland")**

40.    Hajjar Roseland was formed on October 15, 2014.  It is located at 556 Eagle Rock Avenue, Roseland, New Jersey.  I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar Roseland.

4813-3038-5844, v. 1

41.     Hajjar Roseland is the landlord to the following tenants:  Joseph V. DiTrolio, MD; Dr. Jean Makhluof and Dr. Tiziana Anello; Speech & Hearing Associates, LLC; Jonathan Nitche D.M.D., LLC; Strategic Technology Advisors, LLC, d/b/a TeamLogic IT; and Roseland Ambulatory Surgery Center, LLC;

42.     This building was under contract for sale; however, the lender did not approve the sale.  The buyer was a surgery center located at the building.  The surgery center renovated the building and wants to close as soon as possible.  The proposed purchaser has increased the value of the building through these renovations.

### Hajjar Medical Office Building of Jersey City, LLC ("Hajjar Jersey City")

43.     Hajjar Jersey City was formed on November 1, 2006.  I own one-hundred percent of B&B, which owns fifty percent of Hajjar Jersey City.  Jaecals II, LLC owns the other fifty percent.  Hajjar Jersey City is the landlord and leases space to the following entities: Jersey City Medical Center for 7,459 square feet; Jeffrey A. Rapaport, MD P.A. for 1,500 square feet; Garden State Pain Control PA for 2,652 square feet; and Paladina Health, LLC for 2,091 square feet.  There are four office spaces vacant: one for 2,333 square feet, 1,069 square feet, 1,526 square feet, and 11,070 square feet.

### Hajjar Medical Office Building of Wayne, LLC ("Hajjar Wayne")

44.     Hajjar Wayne was formed on April 15, 2009.  It is located at 234 Hamburg Turnpike in Wayne, New Jersey.  I own one-hundred percent of B&B, which owns one-hundred percent of Hajjar Wayne Investments, LLC, which owns fifty percent of Hajjar Wayne.  Jaecals, I, LLC, owns the other fifty percent.

4813-3038-5844, v. 1

45.     This is a three-story multi-tenant medical office building that contains 31,233 square feet of rentable area.  On April 22, 2016, C&W conducted an appraisal and valued Hajjar Wayne at $13,700,000.

46.     Hajjar Wayne is the landlord and leases space to the following tenants: SMG – St. Joseph's for 7,606 square feet; St. Joseph's Regional Medical Center for 1,242 square feet; St. Joseph's for 5,060; St. Joseph's Regional Medical Center for 1,602 square feet; St. Joseph's Regional Medical Center for 1,729 square feet; St. Joseph's Regional Medical Center for 1,917 square feet; and St. Joseph's Regional Medical Center for 12,077 square feet.  I have a contract of sale for this property.

### Hajjar Medical Office Building of Fairlawn, LLC ("Hajjar Fairlawn")

47.     Hajjar Fairlawn was formed on May 22, 2009, and is located at 14-01 Broadway in Fair Lawn, New Jersey.  Ownership is as follows:  I own one-hundred percent of B&B, which owns fifty percent of Hajjar Fairlawn, while Bryan Massoud owns thirty percent, Andranik Howhanessian owns ten percent, and John Lee Berger owns ten percent.

48.     It is a two-story multi-tenant medical office building. On April 22, 2016, C&W appraised Hajjar Fairlawn for $6,500,000.  Hajjar Fairlawn is the landlord and leases space to the following entities:  Children's Ambulatory Surgical Center for 8,000 square feet and Sovereign Medical Group, LLC for 7,000 square feet.

### Hajjar Medical Office Building of Glen Rock, LLC ("Hajjar Glen Rock")

49.     Hajjar Glen Rock was formed on October 22, 2015 and is located at 85 Harristown Road, Glen Rock, New Jersey.  It is a two-story multi-tenant medical office building that contains 43,914 square feet of rentable area.  The ownership structure is as follows:  I own one-hundred

4813-3038-5844, v. 1

percent of B&B, which owns fifty percent of Hajjar Glen Rock; Mass Realty, LLC owns twenty-five percent; and Jaecals, III, LLC, owns twenty-five percent.

50.     Hajjar Glen Rock is the landlord to the following tenants:  SK Auto Imports; Sovereign Medical Billing; Sovereign Medical Group – ENT of Midland Park Office; Sovereign Medical Group, LLC; and Oasis Medical.

51.     On April 22, 2016, C&W prepared an appraisal report and valued Hajjar Glen rock valued at $14,600,000.

### Hajjar Medical Office Building of Miramar, LLC ("Hajjar Miramar")

52.     Hajjar Miramar, incorporated in Florida on October 22, 2015, is located at 14601 Southwest 20th Street, Miramar, Florida.  I own one-hundred percent of B&B, which owns one-hundred percent of MMB Management Advisory Services, LLC ("**MMB**").

53.     On July 21, 2008, MMB purchased the Miramar property from Alton Miramar MOB, LLC.  The purchase was for the acquisition of Unit A of Palm Gardens at Miramar, a commercial condominium.  MMB owns Hajjar Miramar.  When the loan converted to Wells Fargo, it became Hajjar Miramar.

54.     The property is a condominium unit located within a three-story multi-tenant medical office building that contains 39,872 rentable square feet.  On April 22, 2016, C&W conducted an appraisal and valued Hajjar Miramar at $6,600,000.

55.     I currently have a contract of sale for Hajjar Miramar / MMB.

56.     MMB is the landlord and leases space to the following entities: Surgicare of Miramar, LLC for 12,016 square feet and Orthopedic Specialists of South Florida, PA for 2,145 square feet.  There is one space vacant for 1,729 square feet.

4813-3038-5844, v. 1

**Hajjar Business Holdings, LLC ("HBH")**

57.     HBH is located at 15-01 Broadway, Fair Lawn, New Jersey.  The property consists of several medical office condominium units within a three-story multi-tenant.  I own one-hundred percent of B&B, which owns one-hundred percent of HBH.  On April 22, 2016, C&W conducted an appraisal of this property and valued it at $4,400,000.

58.     HBH is the landlord and leases space to the following tenants:  Surgicare Surgical Associates of Fairlawn, LLC; Help at Home Services, LLC and ATC Academy; Sovereign Laboratory Services, LLC;  and Urology Specialty Care, PA

**Owner Debtors**

59.     The Owner Debtors are HMOB of Wayne Owner, LLC; HMOB of Oradell Owner, LLC; HMOB of Carlstadt Owner, LLC; HMOB of Hackensack Office Owner, LLC; HMOB of Hackensack Warehouse Owner, LLC; HMOB of New Brunswick Owner, LLC; HMOB of Roseland Owner, LLC; HMOB of Jersey City Owner, LLC; HMOB of Fairlawn Owner, LLC; HMOB of Glen Rock Owner, LLC; HMOB of Fairlawn 15-01 Broadway Owner, LLC; HMOB of Mount Kisco Owner, LLC; and HMOB of Miramar Owner, LLC.

60.     The Owner Debtors are Delaware limited liability companies and may or may not own all the real property directly which allegedly serves as collateral to the Secured Lender (defined herein).

61.     The Owner Debtors are borrowers of a certain loan described more fully herein.

## THE DEBTORS' MANAGEMENT

62.     Regent manages the Operating Debtors and has twelve employees.  I am employed by Regent.

63.     My job responsibilities include, marketing the Operating Debtors, communicating with vendors, negotiating contracts for new tenants, overseeing the finances and accounting of the companies, and generally ensure the buildings are operating effectively.  I have worked diligently in order to continue building relationships to maintain and grow the businesses.  All of the properties are "Class A" buildings.

64.     The Operating Debtors hold general liability insurance.  A copy of the Declaration page is attached as **Exhibit B.**

## CIRCUMSTANCES LEADING TO BANKRUPTCY

65.     On or about April 29, 2016, Natixis Real Estate Capital, LLC ("**Natixis**") made a commercial loan in the original principal amount of $81,500,000 (the "**Loan**") to the following entities:

- HMOB of Wayne Owner, LLC;

- HMOB of Oradell Owner, LLC;

- HMOB of Carlstadt Owner, LLC;

- HMOB of Hackensack Office Owner, LLC

- HMOB of Hackensack Warehouse Owner, LLC;

- HMOB of New Brunswick Owner, LLC;

- HMOB of Roseland Owner, LLC;

- HMOB of Jersey City Owner, LLC;

- HMOB of Fairlawn Owner, LLC;

- HMOB of Glen Rock Owner, LLC;

- HMOB of Fairlawn 15-01 Broadway Owner, LLC;

- HMOB of Mount Kisco Owner, LLC; and

4813-3038-5844, v. 1

- HMOB of Miramar Owner, LLC (collectively, the "**Borrowers**")

66.    In connection with the Loan, the Borrowers and Natixis entered into a loan agreement on April 29, 2016.  The Borrowers executed an Amended and Restated Promissory Noted in the amount of $81,500 (the "**Original Loan**").

67.    On April 29, 2016, the Borrowers and Natixis executed a Note Splitter and Loan Document Modification Agreement (the "**Note Splitter Agreement**").   The Note Splitter Agreement split the Original Loan into two promissory notes.  The notes provide that interest shall accrue at 5.21300% per annum.   Upon occurrence of the event of default, under the loan documents, interest must be paid at the default rate, 4.000% above the interest rate, compounded monthly.

68.    To secure the payment under the notes, the Borrowers executed and delivered certain mortgages, assignments of leases and rents and security agreement, in favor of Natixis.

69.    On May 24, 2016, the loan was sold and securitized  to Wells Fargo Commercial Mortgage Trust 2016 C34, Commercial Mortgage Pass Through Certificates, Series 2016 C34 ("**Secured Lender**").

70.    The Loan was made to multiple borrowers and secured by, among other things, first mortgage liens on eleven (11) commercial properties located in New Jersey.  It does not appear that two parcels of real property located in Miramar, Florida and Mount Kisco, New York are owned by the respective debtor borrowers.[3]

71.    In December 2019, the Secured Lender commenced seven (7) separate foreclosure actions in these states following multiple events of alleged default under the loan documents.  As

---

[3] Upon information and belief, borrower HMOB of Miramar Owner, LLC is not the record owner of certain real property described as Commercial Condominium Unit No. A of Palm Gardens at Miramar located in Broward County, Florida.  Similarly, borrower HMOB of Mount Kisco is not the record owner of certain real property described as 103-105 South Bedford Road, located in Westchester County, New York.  The Debtors are still conducting due diligence.

of October 5, 2019, the borrowers owe Secured Lender the sum of $90,094,331.83, together with attorneys' fees and costs.

72.     Secured Lender has commenced actions to foreclose the mortgages encumbering the properties owned by the Debtors.

73.     On January 29, 2020, the Secured Lender filed a motion for an order appointing a rent receiver (the "**Receiver Motion**").  The Receiver Motion was returnable February 14, 2020.

74.     As a result of certain tenants' inability to pay rents, the Secured Lenders loan went into default.  Most of the tenants that owe rents are my companies.  As noted, due to the influx of HMOs and reduction of reimbursement for medical services, my companies have not had the ability to pay all of their rent.  Thirty percent of the buildings are unoccupied.  Thirty percent are performing and forty percent consist of my companies, in whole or part.

## CAPITAL STRUCTURE

### Secured Debt

**A.  Secured Debt**

75.     As outlined above, the Secured Lender is a secured creditor of the Owner Debtors.

**B.  Unsecured Debt**

76.     The Operating Debtors owe certain vendors as of the Petition Dates.  The Debtors are analyzing the claims and will set forth such creditors when all schedules are filed.  These creditors are essential to the Operating Debtors' businesses, as they provide the materials necessary for the Operating Debtors to provide services.

**C.  Mezzanine Loan**

77.     There is a mezzanine loan in the original principal amount of $10,000,000 as evidence by a certain promissory note dated April 29, 2016, made by Borrower in favor of Natixis

Real Estate Capital, LLC, a Delaware limited liability company, which loan is allegedly secured by, among other things, a certain pledge agreement, creating an alleged first priority security interest in among other things, the collateral described as the Borrowers.

### D. **Adequate Protection of Secured Lender**

78.    In the present matter, Secured Lender will be adequately protected during the pendency of the Debtors' bankruptcy cases.  First, the Loan is subject to a sweep account relationship with Debtors whereby the funds, i.e., rents, are secured through a lock box arrangement.  Second, the Debtors' properties are being maintained by a property management company ensuring the thirteen buildings are secure, safe and clean in order to maintain their status as "Class A" properties.  Third, Secured Lender holds an alleged first lien and security interest in substantially all of the Debtors' assets, evidenced by recorded Mortgages, Assignment of Leases and Rents and Security and/or Pledge Agreements.  Fourth, Secured Lender filed UCC-3 Financing Statements on the Debtors' personal property.  Finally, and most importantly, the Debtors propose to make adequate protection payments to protect the Secured Lender.

79.    It is important to note that Secured Lender estimated the value of the Debtors' real properties between $65,000,000 - $75,000,000.[4]  In the Certification of Richard J. Madison, filed in support of Secured Lender's Receiver Motion, paragraph 16 stated "[i]n December 2019, Colliers conducted a brokers opinion of value of each of the Properties (defined in the Motion), which showed that the combined value of the Properties (inclusive of the Property) is less than the amount due Plaintiff by between "$15 million and $25 million."  In the brief (page 4) in support of the Receiver Motion, it alleged, "[a]s of October 5, 2019, Borrowers owed Plaintiff the sum of $90,094,331.83 (the "Debt"), together with attorneys' fees and other costs."

---

[4] The Debtors reserve their rights regarding their opinion of value.

4813-3038-5844, v. 1

80.     As such, by taking the middle road and using the Secured Lender's valuation of $70 million with a contract rate of 5.213%, the monthly interest payment would be approximately $299,000 per month.   The Debtors are estimating an adequate protection payment between $400,000-$425,000, which is an increase of approximately 35% of required amount of adequate protection based on the Secured Lender's opinion of value, in accordance with the Cash Collateral Budget.   Accordingly, Secured Lender will be adequately protected.   Further, the buildings will continue to be well-maintained.

81.     All revenues will be used in connection with a budget.   As set forth in the budget (the "Cash Collateral Budget") annexed to the proposed form of Order as Exhibit A, the Debtors propose only paying amounts that are absolutely necessary to maintain the Debtors' business and operations and to preserve the assets.

82.     A denial of the use of alleged cash collateral to fund the Debtors' day-to-day operations will severely harm the Debtors at a critical time, effectively hindering their ability to reorganize.   Essentially, without the authority to use cash collateral, the Debtors cannot continue to operate, which will cause a loss of going concern value and preclude the ability to reorganize.

**THE DEBTORS' CHAPTER 11 FILING**

83.     The Operating Debtors filed voluntary Chapter 11 petitions on February 13, 2020 and the Owner Debtors filed voluntary Chapter 11 petitions on February 14, 2020 (collectively, the "**Petition Dates**").   The Debtors intend to continue operating their businesses.   The Debtors propose to use their cash and future revenues in accordance with the debtor-in-possession operating budget, which is annexed to the cash collateral order as Exhibit A.   An organizational chart as it relates to Sovereign Medical and certain affiliates is annexed as **Exhibit C**.

4813-3038-5844, v. 1

## REORGANIZATION PURPOSE

84.    To allow for a sale and/or refinance of the Owner Debtors, the Debtors intend to operate their businesses in the ordinary course.  The goal is to maximize the value of the Debtors' assets to benefit all parties in interest.

## FIRST-DAY MOTIONS

85.    Concurrently with the filing of their chapter 11 petition, the Debtors filed certain motions and proposed orders (collectively, the "**First-Day Orders**").  The Debtors request this Court enter each of the First-Day Orders described below, as each is critical to the Debtors achieving successful results in their chapter 11 cases for the benefit of all parties-in-interest.

### A.  Motion for an Order Jointly Administering the Chapter 11 Cases

86.    The Debtors seek entry of an order authorizing the joint administration of the Debtors' Chapter 11 cases.  The Owner Debtors are the borrowers of a loan as it relates to the Operating Debtors.  Joint administration of these cases will obviate the need for duplicative notices, motions, applications, and orders; thereby saving considerable time and expense for the Debtors and their estates.

### B.  Motion for an Order Authorizing the Interim and Final Use of Cash Collateral

87.    The Debtors seek an order authorizing the interim and final use of Cash Collateral and submits further that Debtors' secured creditors will not be harmed by the use of the Cash Collateral because Wells Fargo, its largest secured creditor, will receive adequate protection payments throughout the course of the bankruptcy.  Cash Collateral would be used solely in accordance with the budget annexed to the motion.

88.     Use of cash collateral is imperative as Wells Fargo has mortgages on the Debtors' properties.  Without the use of cash, the Debtors will be unable to fund essential payments, including maintenance of the budget and through its management company.

**C. Motion for an Interim Order and a Final Order (i) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service; (ii) Deeming Utility Companies to Have Adequate Assurance of Payment; and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(a) and 366**

89.     The Debtors seek entry of (i) an Interim Order, and (ii) a Final Order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting the utility companies from discontinuing, altering or refusing service to Hajjar, except as set forth herein, (b) deeming the utility companies adequately assured of future performance on the basis of payment of a two-week security deposit, and (c) establishing procedures for resolving requests for additional assurance of payment.

90.     Uninterrupted utility services are essential to the Debtors' ongoing operations and, therefore, to the success of the Debtors' chapter 11 efforts.  Indeed, any disruption to the Debtors' businesses by virtue of the cessation of utility services by the utility companies will bring the Debtors' operations to a halt.

91.     In accordance with Bankruptcy Code section 366(c)(1)(A), the Debtors propose to provide additional assurance of payment to each utility company.  Specifically, the Debtors propose to issue a security deposit equal to approximately two weeks' estimated average utility consumption to each utility company.

**D. Motion for Authority to Continue to Use Existing Bank Accounts and Business Forms Pursuant to 11 U.S.C. §§ 105(a) and 363(c)**

92.     Currently, the Debtors have bank accounts with Valley National Bank and PNC Bank (collectively, the "**Bank Accounts**").  In the ordinary course of their operations, the

Operating Debtors receive deposits and issues checks, wire transfers and ACH transfers into and out of their Bank Accounts.

93.     The Debtors also seek authority to continue to use their prepetition business forms including, but not limited to, letterhead, invoices, checks, *et cetera* (collectively, the "Business Forms"), without reference to their status as debtors-in-possession.  Requiring the Debtors to immediately print new Business Forms would be burdensome, expensive, and disruptive.  The Debtors will, however, either print or stamp "Debtor-in-Possession" on their checks, and when they replace stock, will obtain checks marked "Debtor-in-Possession."

**E. Motion for an Order Directing Credit Card Processors to Honor Their Contracts with the Debtors Pending Assumption or Rejection Under 11 U.S.C. §§ 365 and 105(a)**

94.     In the ordinary course of business, the Debtors accept payment cards, including credit and debit cards, as payment for rent and other expenses.

95.     These agreements are executory contracts, and the Debtors request an order requiring such agreements to remain in full force and effect until such time as the agreements are assumed or rejected.  These agreements are integral to the Debtors' ability to operate their businesses without interruption and maximize the value of the Debtors' estates.

4813-3038-5844, v. 1

**F.  Motion for an Order Authorizing the Debtors an Extension of Time Within Which to File Statements and Schedules.**

96.      Although the Debtors have commenced the extensive process of gathering the necessary information to prepare and finalize the Schedules and Statements, the 14-day time period provided by Bankruptcy Rule 1007(c) will be insufficient for the Debtors to complete the Schedules and Statements.

97.      Each of the Operating Debtors has separate creditors, necessitating individual review of each of the thirteen (13) schedules and statements of financial affairs. The Owner Debtors have the same creditor, the Secured Lender.

98.      The additional time requested by the Debtors to prepare and file the Schedules and Statements will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of their estates for the benefit of creditors and all parties-in-interest.

I certify, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.


                                   */s/ John Hajjar*
                                   JOHN HAJJAR, President

Dated: February 17, 2020

4813-3038-5844, v. 1